## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

_____
|  )
|  )  Case No.
**Christopher Gary Baylor,**  )
Plaintiff,  )
|  )
|  )
|  )
v.  )  **COMPLAINT FOR FRAUD,**
|  )  **FRAUD IN THE INDUCEMENT,**
|  )  **EXTORTION, GROSS NEGLIGENCE**
|  )  **INTENTIONAL INFLICTION OF**
**AYANO ETO f/n/a AYANO ETO**  )  **EMOTIONAL DISTRESS & UNJUST**
**BAYLOR a.k.a. AYANCE, MilkTea111,**  )  **ENRICHMENT**
**ICE CREAM PRINCESS, ROZA,**  )
Defendant.  )
|  )  **DEMAND FOR JURY TRIAL**
_____)

## COMPLAINT AND JURY DEMAND

Christopher Gary Baylor, by and through the undersigned, sues Defendant Ayano Eto f/n/a Ayano Eto Baylor a.k.a. Ayance, MikeTea111, Ice Cream Princess & Roza, and states:

### NATURE OF THE ACTION

1.     This action arises from the fraud perpetuated by Defendant Ayano Eto ("ETO"), *et al*., to recover damages from false representations ETO made through illegal extortion, and other unlawful acts by taking an improper advantage of a fiduciary relationship[1] to receive immigration benefits[2] and payment at the expense of Plaintiff, Christopher Gary Baylor ("Baylor"), or either directly or indirectly from the United States government under the auspices of State and federal programs[3].

---

[1] I-864, Affidavit of Support Under Section 213A of the INA - USCIS.

[2] Conditional Green Card Waiver,  I-751, Petition to Remove the Conditions of Residence.

[3] I-360, Petition for Amerasian, Widow(er), or Special Immigrant OMB No. 1615-0020.

2.      This is also an action for negligence, willful blindness, intentional infliction of emotional distress, unjust enrichment and fraud in the inducement, based on common law.

## PARTIES

3.      Plaintiff, Christopher Gary Baylor ("Baylor"), is a U.S. citizen and adult resident of the State of Florida. At all times material, Baylor was a victim and is the original source of the assertions made herein.

4.      Defendant, Ayano Eto ("ETO"), is a Japanese citizen and adult who now dwells in the State of Illinois.

## SUBJECT-MATTER JURISDICTION

5.      This Court has jurisdiction over the claims asserted in this Complaint pursuant to 28 U.S.C. § 1331.

6.      This case is subject to diversity jurisdiction under 28 U.S.C. § 1332. No party is a Citizen of the same State and the amount in controversy exceeds $75,000, exclusive of interests and costs. Supplemental jurisdiction exists under 28 U.S.C. §§ 1367.

## PERSONAL JURISDICTION

7.      ETO is not yet a legal resident of the State of Illinois pursuant to Title 86, Chapter 1, Part 100, Section 100.3020 or as defined in IITA Section 1501(a)(20). Her last known address is Lot 3055 PO Box 17370, Saint Paul, MN-55117-0370. Personal service on the aforementioned address is authorized pursuant to Minn. Stat. § 5B.03, subd. 1(3), Minn. R. 8290.0500.

8.      This Court has specific *in personam* jurisdiction under Fla. Stat. § 48.193(1)(a)(2) & (6), §§ 2 and 3 because ETO: committed tortious acts within this State; caused injury to Baylor within this State arising out of an act or omission outside this State; engaged in substantial and not isolated activity within this State, and; is subject to the jurisdiction of the courts of this State through service of process.

## VENUE

9.      Venue in this judicial district is proper under 28 U.S.C §1391(b)(3).

## BACKGROUND

### Visas for Fiancé(e)s of U.S. Citizens

10.     U.S. citizens who want to bring a foreign fiancé to the United States in order to get married, files Form I-129F, Petition For Alien Fiancé(e). This is the first step to obtaining a K-1 nonimmigrant visa for the intended fiancé. The K-1 nonimmigrant visa is also known as a fiancé visa. In order to obtain a K-1 fiancé visa, the U.S Citizen and the nonimmigrant must marry each other within 90 days of entering the U.S. The marriage must be valid, meaning both the U.S. Citizen and nonimmigrant must have a bona fide intent to establish a life together and the marriage is not for the sole purpose of obtaining an immigration benefit. 8 U.S.C. § 1101(a)(15)(K)(i).

### Violation of Nonimmigrant Status or Condition of Entry

11.     A goal of the immigration enforcement system, like that of court systems, is to maximize compliance with the law. Doing so will require, first and foremost, a legal and sensible pathway to comport one's conduct with the law. But compliance with immigration law has gone down, not up. The nation's immigration courts have accumulated an unprecedented and unmanageable million-case backlog.[4] The courts need a new paradigm for the way it enforces immigration laws — a paradigm that is significantly less expensive and simultaneously more efficient. Based on this Complaint, a more efficient determination of facts is available because the admitted alien (ETO) is a nonimmigrant who failed to maintain the nonimmigrant status in which she was admitted. 8 U.S.C. § 1227(a)(1)(c)(ii).

### Federal Standards for Valid Marriages

12.     This Complaint arises from the legal relationship between the parties manifested through fraud. Certain laws are histories that are valuable data for investigating the dynamics of

---

[4] Dep't of Homeland Sec. v. Thuraissigiam, 140 S. Ct. 1959, 1964 (2020) ("As of the first quarter of this fiscal year, there were 1,066,563 pending removal proceedings."); TRAC Syracuse, "Immigration Court Processing Time by Outcome," available at https://trac.syr.edu/phptools/immigration/court_backlog/ (last accessed September 25, 2021)(showing an immigration court backlog of 1.42 million cases through September 2021).

a perceived satisfaction of immigration standards under federal law. The conflicts of law principle states that the validity of a marriage is determined by evidence of a marriage and the law of the place where contracted. 20 CFR 404.725[5], 20 CFR 219.31[6], 20 CFR 222.12[7]. When comparatively viewed, there is no significant difference to violations of traditional commitment between a man and woman under State of federal law. The language under the law where the parties purportedly complied with immigration laws, is clear and unequivocal. Minn. Stat. § 517.01.[8] Based on the facts and evidence contained herein, the parties never legally married.

**Evade the Law Test**

13.     Florida State has always determined the validity of a marriage in accordance with laws of the place where the marriage occurred, and follows the traditional conflict-of-law principles of *lex loci contractus* and *lex loci delicti*, unless the contracting parties have legally contracted with reference to the laws of another jurisdiction. This action is governed by federal law, because the parties have not contracted otherwise in the face of federal immigration laws. This Complaint reflects the need for governments to prevent aliens from intentionally and improperly manipulating their behaviour to prevent mandatory provisions in the law from applying to them. Within the framework of subsection 1255(d), enacted as part of the Immigration Marriage Fraud Amendments of 1986, Pub. L. No. 99-639, § 2(e), 100 Stat. 3537, prevents evasion of the laws.[9] The doctrine applies here.

---

[5] A valid ceremonial marriage is one that follows procedures set by law in the State. . . where it takes place. These procedures cover what. . . witnesses are needed. (emphasis added).

[6] If preferred evidence of a ceremonial marriage cannot be obtained, the applicant must . . . submit sworn statements of at least two persons who have direct knowledge of the marriage. (emphasis added).

[7] Generally, State law provides various procedures which must be followed, such as. . . what witnesses are required. (emphasis added).

[8] So far as its validity in law is concerned. . . the civil marriage is contracted in the presence of two witnesses. Marriages subsequent to April 26, 1941, not so contracted shall be null and void. (emphasis added).

[9] An applicant who was admitted to the United States as a K-1 fiancé(e) but did not marry the United States citizen who filed the petition . . . is also barred from adjusting status under [section 1255]. *Adjustment of Status to That of Person Admitted for Permanent Residence*; Temporary Removal of Certain Restrictions of Eligibility, 59 Fed. Reg. 51091, 51092-93, 1994 WL 543334 (Oct. 7, 1994) (emphasis added).

**Overview of Immigration Romance Scam**

14.    ETO and other aliens use online services to access databases of other enrolled U.S. Citizens to scam potential romantic partners, typically based on certain exploitable criteria. These criteria include race, age, gender, sexual orientation, and location. To facilitate finding a compatible person, aliens like ETO, typically manipulate their online profiles to match their victims to interact with them more easily, often by utilizing Internet-based communications such as email, instant messages, and video or telephone chat.

15.    To use these online services, aliens must typically first create profiles that contain information about themselves. Within these profiles, often are outdated pictures, carefully crafted descriptive and personal information that is viewable by other users using the service.

16.    Online services, including the English teacher website Baylor used to teach English (now inactive), was misused to facilitate fraud or to promote dubious or unlawful scams on U.S. Citizens. Most notably, any online service can be used to find and contact potential romance scam victims. In these scams, the perpetrator poses as a suitor and, after establishing a trusting relationship with the U.S. Citizen, deceives him or her by convincing the victim of the misrepresentation about establishing a legitimate relationship.

17.    This is what may be classified as a "D-2 case" (for deception), as defined by the "Center for Immigration Studies" that states: "a citizen unwittingly enters into a marriage with an alien that the latter does not intend to honor. . . Fraud takes place when the alien (usually, but not always, a woman) marries a citizen and then falsely accuses him of physical or emotional abuse and, if she succeeds in her claim, gets an instant green card. This is done under the Violence Against Women Act (VAWA), which is part of the immigration code."[10]

18.    In D-1 cases, the alien strings along the citizen spouse until two years have passed. But D-2 cases requires the alien and citizen to live together for a longer period. *Id.*

---

[10] Two Small Bits of Good News on the Marriage Fraud Front, By David North on September 2, 2014. Found at: https://cis.org/North/Two-Small-Bits-Good-News-Marriage-Fraud-Front

## **FACTUAL ASSERTIONS**

**Overview of Parties Initial Encounter**

19.     To recall, Yahoo Messenger ("YM") was launched by Stanford graduates Jerry Yang and David Filo in 1998, and it managed to run for a long 20 years. In its prime years, the service was the most used as it was an alternative to emails and SMS messaging. However, with the advent of Smartphones, Facebook, and eventually WhatsApp, Yahoo Messenger lost its steam and online users started to switch. Other services that succumbed to competition over the years include MSN Messenger, AOL, ICQ, and even Orkut.

20.     YM provided a vast category of topics to discuss, ranging from learning or teaching a foreign language — to romance, as shown below.



21.

22.     YM simulated modern day pen pals, where strangers relationships were based primarily, or even solely on their exchange of online text messages. YM did not avail any personal photos, descriptions or other personally identifiable information, even in its prime. Not until the advent of faster internet did the way individuals communicate online change.

23.     Yahoo gradually discontinued YM in the year 2012, on December the 14th, yet the advancements in its online messaging platform remained simple, as shown below.



24.

25.     Among many YM users who were disturbed by Yahoo's announcement it would be closing 'Yahoo Chat Rooms', Baylor, who occasionally used the online service to solely aid in the teaching of English as a Second Language ("ESL") to men and woman in several foreign countries, by chance, found a different online medium for teaching.

26.     At the end of YM, many online users like Baylor were left without a way to communicate with their students. Following the closure of YM in December 2012, on January 02, 2013, Baylor joined another international website for teaching ESL online, formerly known as "Rikai Friends" ("RIKAI"), formerly known as "World Friends" ("WF").



27.

28.     RIKAI featured user rich profiles, like ETO's profile shown below, which contains photos, details, location and other personal information, unlike the basic information

provided in YM.



29.     http://rikai.worldfriends.tv/member/browse.jhtml?action=profile&profileId=2950261          1/3/2013 11:29:18 PM

30.     RIKAI is where the parties first met, and where ETO initiated contact with Baylor

by sending him a "Smile" beginning on January 3, 2013, as shown below.



31.

32.     On the following day Baylor joined RIKAI — ETO indicated she had a primary interest in learning ESL. ETO then later stated she had a definite interest in Black American men, who were Christian. The parties communicated in ESL over the course of 3-weeks.

33.     After that time, ETO further expressed interest in developing a deeper relationship with Baylor, and with in-depth knowledge ETO began explaining the process to Baylor, in great detail, of initiating an I-129F, Petition For Alien Fiancé.

34.     On May 5, 2013, ETO proposed and promised to marry Baylor because she also had strong Christian beliefs, loved Blacks, wanted 3-daughters named (Harmony, Melody & Symphony) for their love of music and a family band, and grow old together. Under seemingly reasonable circumstances, on May 23, 2013, the parties sent an I-129F, Petition For Alien Fiancé to the Department of Homeland Security ("DHS") and thereafter or about August 15, 2013, received an I-797, Notice of Action approving the petition, attached hereto as **Exhibit "A"**.

35.     The parties planned for ETO to arrive to the State of Minnesota, where they Baylor's company provided for him a temporary work address while on contract. The parties agreed afterwards they would return to the State of Florida.

**Defendant's Conscious Violence Was Reckless and Malicious Behavior to Commit Fraud**

36.      On November 18, 2013, ETO arrived to the United States, in the State of Minnesota. The next day, ETO began attacking Baylor by punching him in the mid-stomach, sides of his face, upper arms, kicked his shins and scratched him on the forearms. ETO also spit in Baylor's face once.

37.     When Baylor did not retaliate with any violence, ETO began throwing ceramic dinner plates and bamboo salad bowls at Baylor, and the front living room wall and floor. At the time, Baylor believed ETO was suffering from homesickness or culture shock, and had no

knowledge of ETO's intent to provoke him into committing equal violence.

38.    It was not until ETO secured a ceramic knife from the kitchen and began stabbing in Baylor's direction while verbally assailing his Christian beliefs by stating she did not believe in his God, Baylor contacted ETO's mother, Noriko Eto ("NORIKO"), initiating a conversation that began via telephone, then later continued through Facebook Messenger, as shown below.



39.

NORIKO Facebook Message Response 1



40.

NORIKO Facebook Message Response 1 - Translation



41.

NORIKO Facebook Message Response 1 BAYLOR Reply - Translation

42.     Despite Baylor's effort to amicably resolve ETO's violent tendencies, ETO's physical abuse against Baylor through November 19, 2013 to February 2014, did not discontinue. Following Baylor's conversation with the mother, NORIKO — ETO's physical assault worsened to the degree she began threatening Baylor's life and her own, where Baylor genuinely expressed his fear in messages on December 23, 2013 at 5:52am, as shown below.



43.

BAYLOR Facebook Message Reply 2



44.

BAYLOR Facebook Message Reply 2 - Translation

45.     In at least one dozen messages, Baylor expressed grave concern regarding ETO's violent behavior, as seen below, but her repeat violence against him was so life threatening, he decided not to marry ETO and began making arrangements for his former K-1 fiancé to return to Japan. He no longer wished to continue their relationship beyond the 90-day period in which the parties originally planned to marry.



46.

47.

48.     While online language services provide basic translation of Baylor's conversation, his intent is explicitly clear. Baylor had no intention of marrying ETO.

**Defendant Intentionally and Fraudulently Evades Immigration Requirement**

49.     On February 10, 2014, four days prior to the expiration of ETO's 90-day fiancé visa, and 86-days following ETO's arrival to the United States, Baylor rescinded his decision to marry ETO and continued since December 23, 2013, refusal to marry since misrepresentation of ETO's religious beliefs and physical abuse against him had not subsided.

50.     Since ETO was aware her fiancé visa would expire within 4-days, in order to prevent an illegal stay in the United States, or returning to Japan, ETO resorted to threatening Baylor by stating she would have him imprisoned by filing a false police report of mental and physical abuse against her. ETO also stated she was aware that Black men in America were easily incarcerated due to their skin color and because of American history.

51.     ETO's threats came at the near expiration of her temporary fiancé visa, followed by her refusal to voluntarily leave the United States to return to her home country of Japan, even after Baylor offered to provide a plane ticket free of any financial obligation.

52.     Given the historical disadvantages and circumstances easily and abundantly found throughout American history, including the modern day treatment of African American's in this society, Baylor's well rounded fear due to repeated racial discrimination against Blacks across the United States of America, was compelling enough reason to convince him of the very high probability he would in fact be wrongfully convicted, as it has been the case for the majority of African Americans throughout American history, as it is proven in his every recent case.

53.     ETO's violent acts against Baylor gave him a bonafide reason to fear ETO would retaliate against him, as she had already promised. Even though the parties originally planned to marry in a different State, ETO coerced Baylor to apply for a marriage license in the State of Minnesota, Dakota County, where the parties did not pay the requisite filing fee. Yet the parties

were issued a marriage certificate absent any ceremony and without the presence of any persons who could witness its issuance, as seen attached hereto as **Exhibit "B"**.

54.     Despite ETO's coercive methods forcing the parties into a legal relationship, the parties never legally married according to law, nor prior to the expiration of ETO's fiancé visa.

**Defendant Broadens Coercive Methods to Stay Beyond Two-Year INA Requirement**

55.     On or about March 6, 2014, the parties returned to the State of Florida where ETO's physical violence against Baylor continued near to the end of that year — to such a degree of severity, ETO grabbed a serrated steak knife from kitchen and began chasing Baylor around the kitchen island, which caused in him a continuing fear for his own life.

56.      Unaware of how to cope with such an unfamiliar situation, on November 2, 2014, Baylor placed a 9-1-1 call to the Flagler County Sherriff's Department to have ETO removed from his residence — a call initially interrupted when ETO snatched Baylor's phone from his hand before dialing the second digit. Without a phone, Baylor hid himself from ETO's presence by moving to the middle office room of his house where he locked the door behind him in order to successfully place a 9-1-1 call on his second phone, without interruption.

57.     After successfully placing a 9-1-1 call, Officer Jonathan Kuleski ("KULESKI") was dispatched to Baylor's residence. Although when KULESKI arrived, Baylor was informed that law enforcement had no authority to intervene in civil matters, or could remove ETO. KULESKI informed Baylor he could seek relief by filing a complaint with the local court.

58.     Baylor explained to KULESKI that he had no knowledge or experience on how to file a complaint in court, or any guidance nor resources. Given the fact KULESKI could not assist or intervene in the matter between ETO and Baylor, KULESKI merely logged his dispatch to Baylor's residence, as shown below.



59.

60.

61.    On the morning of November 3, 2014, ETO voluntarily vacated Baylor's home by relocating, via taxi service, to a distant motel, more precisely, the Econo Lodge located at 1614 North US 1, Ormond Beach, FL 32174.

62.    Several days later, Baylor received a disturbing phone call from his sister ("TR"), from which a discussion took place about ETO texting photos of herself inflicting wounds on her arms to simulate grab marks. TR informed Baylor that ETO threatened she would file a false police against Baylor alleging she had been physically and mentally abused. At that time, ETO began harassing TR by sending numerous threats and photos of herself. TR warned Baylor ETO promised she would file a police report if she was not allowed to return to Baylor's residence.

63.    On the evening of November 10, 2014, ETO was allowed to return to Baylor's home given the alarming circumstances in which Baylor and his sister determined that ETO would make good on her threats against him.

64.     Upon returning to Baylor's residence, ETO's behavior drastically changed to the degree, ETO made no physical or verbal attacks against Baylor following KULESKI's visit to Baylor's home. ETO made a conditional promise that she would not make any false reports of abuse against Baylor to law enforcement if she was allowed to stay at Baylor's home.

65.     For approximately three weeks, the parties cohabitated without threats from ETO, until December 7, 2014, ETO resumed physically assaulting Baylor with punches to both his body and face. On or about December 8, 2014, to protect himself from abuse, Baylor temporarily escaped from his home by sneaking out in the middle of the night to stay in a hotel located more than 267 miles away from ETO, in the city of Fort Lauderdale, Florida, as shown below.



66.

67.     During the parties' separation, Baylor found evidence of ETO seeking to engage in extramarital relationships with other Black men in the United States, for sex and re-marriage, particularly in the State of Florida.

68.     During ETO's self removal from Baylor's residence following KULESKI's visit,

on a website named CyberTM ("CTM"), ETO created an online profile under the pseudonym "Milktea111" on November 10, 2014 at 3:40pm, a username that combines "milk and tea" to reflect ETO's skin color, as seen in her online profile, *Ibid* at Pg. 8. The now inactive CTM profile corresponds to the dates the parties separated. The first date, November 10, 2014, is when ETO returned to Baylor's home. The second date, December 8, 2014, is when Baylor escaped. At these times, ETO paused her search for other men under those online aliases.



69.

70.     ETO's use of both online aliases, "Milktea111", as shown above, and "Ice Cream Princess", as shown below, where created to attract men on websites frequented by ETO, created for sex, as shown below.



71.

72.     Given the fact ETO sought to have extramarital affairs with other men in the U.S. while purportedly married — Baylor temporarily created an online alias on December 12, 2014 at 7:55pm, as shown below, solely to monitor ETO's illicit online activity on RIKAI's sister website also used by ETO, formerly known as WORLD FRIENDS ("WF").



73.

74.     Baylor, under the temporary guise of "MARCUS", allegedly resided in Saint

Augustine, Florida, approximately 26-miles away from ETO, as shown below.



75.

76.     Nearly less than one hour of Baylor's temporary online profile becoming active on WF — without any encouragement, ETO initiated contact with it by simultaneously sending a "Smile" and email at 9:04pm, as shown below.



77.



78.

79.     ETO's deliberate interest in, and or having extramarital affairs with other men, like MARCUS, shows that the parties purported marriage was never bonafide, even if uncoerced. ETO's interest in MARCUS is clearly shown in 21-consecutive emails from ETO, within 2 hours of initiating contact with an absolute stranger, as shown below, in which she stated she wanted to meet MARCUS, get married and have a baby.



80.

81.     After sending successive emails to MARCUS, ETO plead to communicate with him using an external messenger service called "NAVER LINE" ("LINE"). Baylor, as MARCUS, agreed to communicate using LINE, where his true identity was later revealed after ETO recognized Baylor's personal phone number linked to LINE during the registration process.

82.     After ETO discovered MARCUS, was in fact Baylor who she had sent numerous messages about: meeting him, sex, divorce, re-marriage and having a baby, ETO immediately ceased all communication.

83.     It was not until December 21, 2014, ETO resumed communicating with Baylor via text messaging, informing Baylor she was three or more weeks pregnant, as shown below.



84.

85.     On December 22, 2014, ETO called Baylor on his cell phone demanding that he return home. Because Baylor was in shock, the parties never discussed ETO's extramarital

activities. It was alarming enough to receive a call from ETO demanding his return. Baylor refused to comply in fear ETO would threaten his life again. In doing so, ETO merely shifted the focus of her abuse to her alleged pregnancy, where ETO promised she would forcibly terminate it by punching herself in the stomach, then falsely accuse Baylor of causing a miscarriage.

86.     Given that ETO self inflicted pain and injury on herself to coerce her way back into Baylor's home after the parties separated on November 2014, and Baylor's religious belief against terminating innocent unborn children, he departed Fort Lauderdale, Florida the same day and returned to Palm Coast, Florida — where ETO awaited. Upon returning, ETO demanded that Baylor stay home, not leave for work or seek employment, so that she could always see him.

87.      For five months, ETO redirected her physical threats against a developing fetus, and continued to threaten Baylor with falsely reporting abuse against him if he left her, until April 2015 when ETO shifted her demand that Baylor change her immigration status by filing an I-485, *Application to Register Permanent Residence or Adjust Status*, with the United States Citizenship and Immigration Services ("USCIS").

88.     Using KULESKI's dispatch to his home as leverage, Baylor managed to refuse ETO's demand until its use became ineffective on May 2015, when ETO began punching her stomach causing purplish marks on her skin. Watching ETO punch the front and sides of her stomach in rage almost made Baylor throw up, and sick enough to nearly faint at the idea of a dead baby inside of ETO's stomach, all for the sole purpose of adjusting her immigration status. It was not only against Baylor's religious belief, but his moral principles.

89.     Subject to ETO's threats against him and now the unborn child, on May 18, 2015, Baylor used part of his emergency savings that had substantially diminished, partly consisting of Japanese YEN, and converted it into USD to pay for ETO's I-485 application, in the amount of

$1,070, as seen below.



90.

91.     On June 17, 2015, ETO received an initial response from DHS rejecting her I-485

application, stating it was insufficient to establish her eligibility, as seen below.



92.

93.

94.   On August 7, 2015, ETO received a second letter from DHS, as shown below, stating that ETO must submit sufficient evidence of income to establish eligibility for adjustment of her immigration status within 45-days of receipt of the letter.



95.

96.   On August 22, 2015, ETO gave birth to Aaliyah Bee Baylor ("AA") at the Halifax Medical Center, 303 N Clyde Morris Blvd, Daytona Beach, FL 32114, as shown below.



97.

98.     After receiving two letters from DHS indicating ETO's eligibility status could not be determined because of insufficient proof of income, unfamiliar with the immigration process, ETO solemnly swore, as notated on a piece of paper she handed to Baylor, that she would kill AA to collect her life insurance so that ETO could prove her financial eligibility status. ETO said she would payback Baylor for delaying her green card application, as shown below.



99.

100.    ETO's threats were not inconsistent with her writings where she indicates "Crazy it's my middle name", as shown below. In order to prevent ETO from further making threats against AA's life, or making a fraudulent police report containing allegations of abuse, Baylor stated to ETO that he would need to return to work in order to assist with her application. ETO then allowed Baylor to seek employment again.



101.

102.     Since the time ETO wrote threatened Baylor with "payback" on August 26, 2015, no further verbal or physical threats were made against Baylor or AA — until one month later. On September 25, 2015, ETO became uncontrollably violent behind the notion of having to wait for  Baylor to find employment so that she could change her immigration status.

103.      Very much to the same degree ETO would sustain her earlier physical and verbal abuse against Baylor for a period of twenty-two hours or more, expressed in part of Baylor's messages to ETO's mother — NORIKO — as shown below in red, Baylor could not calm ETO's rage, hostility or violent temper towards him or AA, to any lesser degree, or in less than 30 hours, the length time in which ETO relentlessly continued her verbal abuse.

104.



105.     During ETO's violent outbreak, she began walking towards the bedroom where AA slept while ETO was yelling she would kill AA. Fearful of his own life and for AA's, Baylor intercepted ETO by first entering the room and closing the door behind him.

106.     While holding and locking the door, ETO began violently punching holes in it and kicked its handle in an effort to forcibly enter the room to institute her earlier promise of getting back at Baylor by causing physical harm to AA. ETO's extensive damage was noted as part of a list for repairs, as shown below.

107.    | $ | 100.00 | Replace broken door on front bedroom 30" 6 panel door, paint A100 Gloss White |

108.    | $ | 50.00 | Repair/Replace door handles to front bedroom and guest bathroom. |

109.     ETO eventually broke through the bedroom door where Baylor stayed in fear to protect AA, who was crying fiercely. After entering the room, ETO relentlessly engaged in interrogating Baylor in very close proximity, face-to-face, repeatedly asking him about his

employment status while depicting her hands in a choking manner towards Baylor.

110.    Not until ETO finished interrogating Baylor, was he allowed to exit the bedroom, where he then went to the middle office room to look for his cell phone to call for emergency assistance. From that room, Baylor heard ETO throwing unfamiliar objects against the walls, and punching them while screaming at AA in her native tongue (Japanese). While attempting to retrieve his cell phone, Baylor heard AA's crying muffled for at least 5-seconds, more than twice. After finding his cell phone, Baylor rushed back to the entrance of the room where AA stayed and noticed ETO standing over AA while clinching her plush toy. At the same time Baylor began dialing, ETO rushed out of the bedroom. Baylor called a 24-Hour Abuse Hotline.

111.    On September 26, 2015, the Florida Department of Children and Families ("DCF") sent Karen D. Harrison to Baylor's residence to investigate, as shown below.



**CONFIDENTIAL INVESTIGATIVE SUMMARY (IS)**
**Child In-Home Investigation**
**(without Reporter Information)**

| Case Name | Intake Number | Intake Sub-Type | County |
|---|---|---|---|
| Ayano Eto Baylor | 2015-257763-01 | In-Home | Flagler |
| Date/Time Intake Received | Date/Time Screening Decision | Protective Investigator | |
| 09/26/2015 2:43 AM | 09/26/2015 3:51 AM | Harrison, Karen D | |
| Date/Time Investigation Closed | | Approving Protective Investigative Supervisor | |
| 11/12/2015 11:29 AM | | Anger, Joy M | |

**I.    Allegation Narrative(s)**

| Sequence Type | Date/Time Received | Response Priority |
|---|---|---|
| Initial | 09/26/2015 2:43 AM | 24 Hours |

112.

113.    During the investigation, ETO dramatically changed her demeanor to evade any detection that any mistreatment to AA took place, an interview process that excluded Baylor from being considered as a victim of ETO's abuse. ETO merely admitted to yelling at AA in Japanese and controlling AA's crying by holding AA under her armpits.

114.    Upon completion, DCF informed ETO that she would be investigated for a period of time. ETO did not decipher the length of time for which the investigation would occur, and for approximately 1-year, ETO did not use verbal or physical attacks against AA or Baylor.

115.    On or about September 2016, ETO discovered she was not under investigation by DCF, and resumed her verbal and physical threats against Baylor and AA. Out of overwhelming concern for himself and AA's life, Baylor attempted to relocate with AA to a undisclosed location where ETO could not act on her threats of violence against AA or allege abuse against Baylor in order to have him incarcerated under false pretense.

116.    At that time, Baylor had saved enough money to escape ETO's abuse, and on September 14, 2016, filed a move-out notice under emergency reasons, which the realtor subtly acknowledged as "life circumstances" in its response, as shown below.



117.

118.    On or about September 18, 2016, ETO intercepted a mailed copy of the move-out-notice, causing her to become enraged to the point she began head bunting the interior walls of Baylor's home. After ETO finished assaulting Baylor's home with her own body, she moved briskly to the kitchen to grab a plain cutting knife and threatened to stab Baylor if he relocated without her. Fearing for his life, Baylor hurried quickly to the middle office where he stayed for

approximately 15-minutes while ETO threatened to injure only him.

119.    When ETO realized her physical threats against Baylor ended in an undecided stand-off, she began resuming threatening to take the life unprotected AA. ETO then demanded that Baylor pay a ransom sum of $30,000 USD, in exchange for AA's life and dissolution of their legal relationship. ETO promised that she would return to Japan and leave AA in his care because she knew how much he loved and cared for AA, despite ETO's illicit activities.

120.    In a life threatening manner, Baylor immediately agreed to pay ETO her ransom sum of $30,000 USD, out of fear for AA, his own safety and to end the parties relationship. On September 18, 2016. Baylor hurriedly applied for a high interest personal loan which he could not afford, through a direct lender called "The Lending Club", as shown below.



121.

122.    Upon receipt of the funds within one week, Baylor directly gave ransom payment to ETO in the amount of $30,000. After ETO received payment, she stated she had no intention of returning to Japan. In fear of retaliation by ETO, Baylor did not request that ETO return the money. Instead, Baylor complied with ETO's demand to relocate with him and AA, where after the parties vacated Baylor's current residence in the State of Florida on or about October 1, 2016, began to temporary dwell in a hotel called "Mainstay Suites", located in Alcoa, TN, as shown below.

**MainStay Suites (TN287)**

361 Fountain View Circle
Alcoa, TN 37701
(865) 379-7799
GM.TN287@choicehotels.com

Account: 487650015
Date: 10/8/16
Room: 302  BAR
Arrival Date: 10/3/16
Departure Date: 10/8/16
Check In Time: 10/3/16 1:31 PM
Check Out Time:
Rewards Program ID:
You were checked out by:
You were checked in by: kmcfar
Total Balance Due: 0.00

BAYLOR, CHRIS
NONE
Maryville, TN 37801

| Post Date | Description | Comment | Amount |
|---|---|---|---|
| 10/3/16 | Room Charge | ROOM CHARGE FOR 10/2/2016 | 72.74 |
| 10/3/16 | State Tax | | 7.09 |
| 10/3/16 | Occupancy Tax | | 4.36 |
| 10/3/16 | Other Tax | | 0.14 |
| 10/3/16 | Sales / Misc tax | | 1.50 |
| 10/3/16 | Room Charge | #302 BAYLOR, CHRIS | 72.74 |
| 10/3/16 | Sales / Misc tax | | 1.50 |
| 10/3/16 | Other Tax | | 0.14 |
| 10/3/16 | State Tax | | 7.09 |
| 10/3/16 | Occupancy Tax | | 4.36 |
| 10/4/16 | Room Charge | #302 BAYLOR, CHRIS | 72.74 |
| 10/4/16 | Sales / Misc tax | | 1.50 |
| 10/4/16 | Other Tax | | 0.14 |
| 10/4/16 | State Tax | | 7.09 |
| 10/4/16 | Occupancy Tax | | 4.36 |
| 10/5/16 | Room Charge | #302 BAYLOR, CHRIS | 72.74 |
| 10/5/16 | Other Tax | | 0.14 |
| 10/5/16 | Sales / Misc tax | | 1.50 |
| 10/5/16 | Occupancy Tax | | 4.36 |
| 10/5/16 | State Tax | | 7.09 |
| 10/6/16 | Room Charge | #302 BAYLOR, CHRIS | 72.74 |
| 10/6/16 | State Tax | | 7.09 |
| 10/6/16 | Other Tax | | 0.14 |
| 10/6/16 | Occupancy Tax | | 4.36 |
| 10/6/16 | Sales / Misc tax | | 1.50 |
| 10/7/16 | Room Charge | #302 BAYLOR, CHRIS | 72.74 |
| 10/7/16 | State Tax | | 7.09 |
| 10/7/16 | Occupancy Tax | | 4.36 |
| 10/7/16 | Other Tax | | 0.14 |
| 10/7/16 | Sales / Misc tax | | 1.50 |
| 10/8/16 | Master Card | | (514.98) |

123.

124.    The parties temporarily resided in the State of Tennessee until Baylor could successfully return to the State of Florida, or evade ETO's coercive methods that continued for the duration of time the parties remained hinged together for approximately another 1-year.

**<u>Defendant Uses Fraudulent Statements to Adjust Immigration Status</u>**

125.    The Immigration Marriage Fraud Amendments of 1986, which places a two-year conditional period on a K-1 Visa holder's permanent residency status would bar ETO if her dissolution of marriage, even if void, occurred within two years, which would also lead to removal or denial of adjusting her immigration status.

126.    Privy to this information, ETO delayed dissolution of the parties legal relationship beyond the two year requirement, which did not begin until Baylor temporarily relocated to the State of Tennessee to evade ETO's physical and verbal abuse against him and AA.

127.    During the parties temporary visit to Tennessee, Baylor noticed ETO spent all her time online befriending a Facebook user by the name(s) of: ERIKO SUZUKI PFANNENSTEIN, f/n/a ERIKO N. AZANGUE, f/n/a ERIKO ANDO, also f/n/a ERIKO SUZUKI ("EP"). EP is a 47 year-old Japanese citizen who entered the United States holding a K-1 Visa, but since has divorced and remarried at least four known times, and has become a subject-matter expert in divorce and adjustment of immigration status without the need of a U.S. Sponsor.

128.    ETO and EP frequently communicated across Facebook, by telephone and the obscure messenger service known as LINE. There, EP encouraged ETO to instigate a discussion about divorce with Baylor on September 13, 2017, as shown below.



129.

130.   ETO knew that she could not provoke Baylor into committing abuse against her, or that further abuse against AA would impede a favorable decision for her in court.

131.   Unaware of ETO and EP's plan at the time, Baylor was relieved ETO insisted on separating without the use of verbal threats or physical assault. On or about September 14, 2017, Baylor found temporary work in the State of Minnesota to pay for the cost of the parties temporary visit and dissolution of relationship — an action ETO promised she would begin shortly after the parties' arrival.

132.   On September 16, 2017, the parties began traveling to the State of Minnesota — with AA — where for the first time, they temporarily stayed in short term accommodations known as "AirBNB", located at 10036 Clearwater Court, Lonsdale, MN 55046, as shown below.



133.

134.   It was not until the parties arrived to the State of Minnesota for dissolution of their relationship, ETO began to physically assault Baylor again by punching and slapping him on his arms, face and chest.

135.   At no time after arrival did ETO commence or discuss any plans for the parties to dissolve their purported marriage. Instead, ETO became enraged at the mere suggestion the parties should begin paperwork to dissolve their relationship, and ETO repeatedly assaulted

Baylor in an effort to provoke him into retaliating with similar abuse, which he did not.

136.    On September 20, 2017, Baylor presented ETO with self guided legal documents for commencing dissolution proceedings, but ETO adamantly refused to end their acrimonious relationship and instead resumed striking Baylor on his arm, partly captured from a video, as shown below.



137.

138.    ETO's propensity for assaulting Baylor was not impeded by her size or gender. Even though ETO repeatedly struck Baylor, he never responded by retaliating against ETO for her excessive physical, verbal or mental abuse against him or AA, since she might use weapon against them.

139.    Unsuccessfully provoking Baylor into retaliation, on September 23, 2017, ETO contacted EP using telephone and text messaging, for advice on how to obtain her green card.

140.    On September 24, 2017, EP drove her personal car to where the parties stayed to retrieve ETO for a visit to EP's residence located in Saint Paul MN 55104.

141.    ETO willingly abandoned AA in Baylor's care on the same day ETO visited EP. Baylor and AA joyfully spent part of the day at the Minnesota Zoo enjoying the parks amenities, including the water park, where AA excitedly ran through the water sprinklers soaking her red dress, later shown wearing a dry Minnesota Zoo t-shirt at IKEA, where Baylor and AA visited to eat dinner, as shown below.



142.

143.    Upon returning from EP's residence in Saint Paul, MN, ETO refused to discuss with Baylor the dissolution of their legal relationship, and for approximately two weeks, Baylor extended the parties temporary stay at AirBNB awaiting ETO's cooperation.

144.    On the morning of October 4, 2017 at approximately 9:00am, ETO contacted EP and informed Baylor she would be permanently staying with EP, and stated that AA would be better-off in Baylor's care. ETO voluntarily abandoned AA and willfully departed the temporary

AirBNB accommodation, while towing one large and one small suit case.

145.     On the evening of October 4, 2017, Baylor performed his usual duty of providing unconditional care for AA by cooking her dinner, changing her diapers, clothes and tending to AA's emotional needs, which included a good faith video sent to ETO wishing her a good night, recorded while Baylor bathed AA before bedtime, as shown captured from the video below.



146.

147.     On October 5, 2017, two police Officer's from the Lonsdale Sheriff's department visited Baylor at the temporary AirBNB accommodation located at 10036 Clearwater Court, Lonsdale, MN 55046, and was served with an Emergency Order for Protection ("the Order") for ETO on behalf of AA, by the Fourth Judicial District court of Hennepin County, Minnesota.

148.     ETO fraudulently alleged in her petition for protection signed October 4, 2017 at 4:56pm, Baylor physically and mentally abused her and AA. Part of ETO's fraud alleges Baylor abused AA in the State of Florida, and is premised on the non-issuance of her green card, as shown below.

149.     controlling and uses my immigration status and lack of resources to control me, for example, he will tell me one day that he will help me get a green card so I can work, then the next day he will tell me he won't, because I disagreed with him or we had an argument. The Respondent has

150.    ETO's fraudulent allegations made outside court on October 4, 2017, fraudulently alleged she left in fear on the night of October 3, 2017, as shown below.

151.

> controlling person. We will be getting divorced and that will make him even angrier. Last night I left in a hurry with only a couple bags because I was so afraid. The Respondent was

152.    Lee R. Garafalo ("GARAFOLO"), owner of the AirBNB accommodation where the parties temporarily stayed, witnessed ETO leaving on October 4, 2017, as shown below.



153.

> 11.    Q: When was the last time you saw Ayano Eto (Baylor)?
> A:    October 4, 2017

154.

> 16.    Q: If any maintenance was performed that day, can you recall the exact date?
> A:    October 4, 2017
> 17.    Q: If any, can you recall the type of maintenance or repairs being performed that day?
> A:    We had the southern portion of the roof replaced. At the time they were removing Shingles.

155.

> 19.    Q: Can you recall the time of day when you last saw Ayano Eto (Baylor) leave the residence of 10036 Clearwater Court, Lonsdale, MN?
> A:    Yes, it was about 11 am, as I have a split shift and drive early and later in the day

156.    ETO's fraudulent petition vaguely alleges she "was afraid" because the document provided by EP, the "Battered Women's Legacy Advocacy Project", did not give ETO any precise examples for alleging fear, only that it should be presented, as shown below.

157.

> has left the state where the respondent resides the petitioner should present the fear as a *separate*
>
> 3 Minn. Stat. § 543.19

158.

> *injury* that occurred while the battered woman resided *in Minnesota.* The petitioner must be very specific that the separate emotional injury occurred while she resided in Minnesota because "suffering" incidental to an injury which occurred *outside* Minnesota does not fall under the long-arm statute.[5]
>
> The petitioner should make it clear that fear of further assault or emotional injury, created damages to her while in Minnesota. Such damages may include moving expenses, lost wages,

159.    ETO's petition fraudulently alleges that on May 2017, in the morning, Baylor "was woken up" and "kicked her in the back", as shown below.

160.    was woken up. He was mad that I had woken him up and he came into the living room and kicked me in the back. I was sitting on the floor and the minor child was on my knee.

161.    According to detailed GPS logs Baylor submits to the IRS every year for tax purposes, none show Baylor in the same vicinity as ETO on any day or morning for the month of May 2017, as partly shown below and fully attached hereto as **Exhibit "C"**. — ETO's allegations are broad and vague because they are purely on fraud.



162.

163.    ETO's fraudulent petition dated October 4, 2017, is based entirely on fraudulent events that never occurred, and the Order fraudulently obtained was for the purpose of procuring what is commonly dubbed in the immigration community as a "Domestic Abuse Green Card" or Green Card Under the Violence Against Women Act (VAWA).

164.    On November 17, 2017, ETO was granted a two-year protection order against

37

Baylor, as ETO had promised and threatened Baylor with since 2014.

165.    On December 21, 2017, Baylor returned to the State of Florida, as shown below.



166.

167.    On March 11, 2018, while Baylor resided more than 1600 miles away in the State of Florida, ETO fraudulently reported to the Saint Paul, Minnesota police department, Baylor resided in Saint Paul, Minnesota and physically assaulted her.

168.    Because the parties arrived to the State of Minnesota on September 16, 2017, ETO's fraudulent petition filed October 5, 2017, and fraudulent police report filed March 11, 2018, corresponds directly with the State of Minnesota's 180-day residency rule[11] for filing an action in divorce proceedings, as shown below.

169.

170.    Because ETO threatened Baylor with incarceration in the past, she fulfilled her promise of fraudulently filing a false report against him while alleging abuse that never occurred.

---

[11] Except as provided in subdivision 2, no dissolution shall be granted unless: (1) one of the parties has resided in this state, or has been a member of the armed services stationed in this state, for not less than 180 days immediately preceding the commencement of the proceeding. Minn. Stat. § 518.07(1).

ETO's second attempt at alleging abuse against Baylor was for the purpose of obtaining a "Domestic Abuse No Contact Order"[12], which carries criminal penalties and guaranteeing ETO a domestic abuse green card. ETO solely sought to keep Baylor from AA or contesting any divorce proceedings instituted against him. ETO expressed a greater interest in having Baylor arrested, and wished to know when he would be "let out", as shown below.

171.

> AYANO expressed several times that she is terrified of him coming back. She asked if we would be able to find him and what would happen then. She seemed relieved when I told her there would be a pick-up-and-hold for him. She also wanted to know if he did get arrested, how soon he would be let out.

172.   The Saint Paul police department found no evidence or charged Baylor, since ETO's fraudulently made statements were unreliable evidence, and did not have the same weight as in family court. Still, Baylor remains terrified ETO is allowed to commit crimes against him.

173.   On May 14, 2018, while residing in Saint Paul, Minnesota, ETO, filed a Complaint for divorce in Minneapolis, Minnesota where ETO alleged she resided. On June 29, 2018, Baylor, through his attorneys, filed an Answer challenging the court's lack of personal jurisdiction, in which, Baylor was only given one day to respond since ETO did not serve any Summons on Baylor with her Complaint.

174.   For this reason, the Minneapolis court, on June 13, 2018, cancelled the parties first scheduled appearance made without Notice or Baylor's knowledge, as shown in the court's Registry of Action below.

175.

| 06/12/2018 | **e-Service** | |
| | Baylor, Ayano Eto | Serve |
| 06/12/2018 | **e-Service** | |
| | Baylor, Ayano Eto | Serve |
| 06/12/2018 | **e-Service** | |
| | Baylor, Ayano Eto | Serve |
| 06/13/2018 | *CANCELED*   **Initial Case Management Conference**  (1:30 PM) | |

---

[12] (a) A domestic abuse no contact order is an order issued by a court against a defendant in a criminal proceeding or a juvenile offender in a delinquency proceeding for: (1) domestic abuse as defined in section 518B.01, subdivision 2; (2) harassment or stalking under section 609.749 when committed against a family or household member as defined in section 518B.01, subdivision 2. Minn. Stat. § 629.75.

176.    In an envelope postmarked June 24, 2018, through her attorneys, ETO mailed a copy of her Summons only, to an address where Baylor did not reside, as shown below — ETO fraudulently stated both were properly served.



177.

178.     On August 10, 2018, Baylor relieved his attorneys for failing to challenge ETO's personal service fraudulently made by U.S. mail, and continued for more than one year solely challenging the court's lack of jurisdiction, as an already disadvantaged out-of-state resident litigating in a foreign jurisdiction in which he never acquiesced.

179.     On or about September 30, 2019, ETO filed a subsequent petition to extend the original protection Order she obtained by making fraudulent statements. Again, Baylor was not served a copy of ETO's new petition, neither given notice by the Minneapolis court.

180.     ETO fraudulently stated that Baylor was personally served at a residence where he lived. In ETO's fraudulently made police report, she stated she does not know where Baylor lives, as partly shown below.

181.     

> I asked her where CHRISTOPHER would be now or where he hangs out.  She said she didn't know.  He doesn't actually have a permanent address because he travels so much with his job.  He usually rents something on a

182.     Given the fact the parties had no contact since October 2017, ETO fraudulently stated Baylor resided somewhere in the State of Minnesota, and continues to use that same fraudulent statement in separate events solely to suit her own predisposition, while taking advantage of Baylor's inability to adequately defend against fraudulent allegations.

183.     This was the same case in the Minneapolis proceeding dissolving the parties legal relationship in which the Minneapolis court, lacking in personal and subject-matter jurisdiction to dissolve a void marriage, refused to allow Baylor to attend the trial, and entered a one sided decree on October 23, 2019.

184.     On March 11, 2020, Baylor discovered ETO had targeted and persuaded him into applying for a K-1 fiancé visa for the sole purpose of committing immigration fraud, and that ETO's physical attacks against him, from the very beginning, were predicated on circumventing a marriage ETO did not want to enter, because it would be easier to apply for a domestic abuse

green card, which most aliens easily obtain without denial. Baylor learned that ETO had targeted

him because of his strong Christian beliefs, and because she knew that merely alleging a Black

man was angry, is accepted by American society, as another excuse to incarcerate more Blacks.

Obtaining a green card for ETO did not come as easy. After ETO realized she could not provoke

Baylor into committing any kind of abuse against her, she resorted to verbal and physical threats

against him, and later towards AA. As part of her scheme, ETO kept the parties awake for some

20-hours or more, sometimes consecutively. The mental strain put on Baylor was used for the

sole purpose of obtaining a domestic abuse green card, which was later obtained by using fraud

to obtain money, judgments, orders, State and federal aid.

## COUNT I
### (Fraud In The Inducement)

185.    Baylor reasserts by reference to assertions contained in the foregoing paragraphs

of this Complaint.

186.    By virtue of the acts described above, ETO knowingly presented or caused to be

presented, false of fraudulent misrepresentations to Baylor for payment, as detailed in paragraphs

119-122, and benefit as detailed in paragraphs 33, 98, 139, 148, 163, 170 & 184.

187.    As such, a justiciable controversy exists between Baylor and ETO, whether their

marriage was bonafide as required by federal immigration law, as detailed in paragraph 53, or if

their marriage Contract is valid under federal and State law, as described in paragraphs 10-13.

188.    ETO misrepresented to Baylor her religious beliefs, her promise to establish a

bonafide marriage, to remain married, have children through marriage, and genuinely have a love

for Blacks, as detailed in paragraph 34. That among other things, ETO terminated a Contract by

force, as described in 131, 135, 136 and 119-122.

189.    ETO (including her failure and refusal to mutually relieve Baylor by agreement of

a Contract), under the INA's Two-Year Period, tolled and extended the Contract, which Baylor upon information and belief (however disingenuously), believed ETO would terminate the Contract as promised, not by other means.

190.    At the time ETO made false representations to Baylor, she knew them to be false, as detailed in paragraphs 50, 62, 64, 87, 100, 119-122, 167; indeed, ETO made these false representations to Baylor solely to defraud and lure him into entering a marriage Contract and tolling the two year INA requirement, demanding a ransom sum of $30,000.

191.    Baylor reasonably relied upon ETO's knowing misrepresentations, at the time, serious threats coercing Baylor into agreeing to Contact into marriage, as detailed in paragraphs 50-52; remaining in the relationship for a longer period of time, as detailed in paragraphs 55-147; paying an application fee of $1070, as detailed in paragraphs 89-90; paying a ransom sum of $30,000, as detailed in paragraphs 119-122, and; staying out of Minnesota in fear of ETO, as detailed in paragraphs, 165-167. Indeed, ETO took affirmative steps thereafter to deceive Baylor into believing her injurious threats against him and AA were real, including the use of kitchen knives, throwing objects, punching holes in and breaking door handles, head bunting walls, yelling and screaming, all intended to mislead Baylor while ETO's real intent was to persuade him into complying by staying in a legal relationship entered for procuring a green card.

192.    Had Baylor known that ETO's representations were false and fraudulent, Baylor never would have agreed to enter into a marriage Contract, nor would Baylor have agreed to pay application fee of $1070, nor a ransom sum of $30,000, nor would Baylor have stayed in a legal relationship.

193.    As a result of ETO's false and fraudulent misrepresentations and Baylor's reliance thereupon, Baylor has suffered damages.

194.    By reason of the foregoing, Baylor has been injured in an amount determined at trial, but not less than $178,335, plus interest, for which sum ETO is liable to Baylor.

## COUNT II
### (Extortion)

195.    Baylor reasserts by reference to assertions contained in the foregoing paragraphs of this Complaint.

196.    ETO procured Baylor's agreement of the extorted marriage Contract pursuant to which she obtained from Baylor an immigration application payment of $1,070, with his consent, induced by ETO's wrongful use of fear through ETO's physical abuse and verbal threats to falsely accuse Baylor of crimes; unless Baylor acceded to her exorbitant demand for payment.

197.    ETO also procured an additional $30,000 from Baylor, with his consent, induced by ETO's wrongful use of fear through ETO's physical abuse and verbal threats to falsely accuse Baylor of crimes; unless Baylor acceded to her exorbitant demand for payment.

198.    ETO's threats to publically accuse Baylor of committing crimes she knew he did not commit unless he acceded to her exorbitant demands for money constitutes extortion under Fla. Stat. §  836.05.

199.    As a result of ETO's extortion, Baylor has suffered, and will continue to suffer, damages in an amount to be proven at trial. Baylor seeks compensation for all damages and losses caused by ETO's extortion, including but not limited to return of the $31,070, she extorted from him, plus interests, for which sum ETO is liable to Baylor.

## COUNT III
### (Gross Negligence)

200.    Baylor reasserts by reference to assertions contained in the foregoing paragraphs of this Complaint.

201.    ETO owed a duty of care as a K-1 fiancé Visa holder, because of the residual harm associated with a U.S. Citizen's fiduciary responsibility as a sponsor and financial liability to the United States government.

202.    ETO owed a duty of care as a Christian wife, because of the residual harm associated with entering into a sacred covenant, then dissolving it under man man-made law.

203.    ETO breached her legal duty to Baylor and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard for Baylor, because the result of her fraudulent inducement and extortion obtained through threats and violence, caused and causes Baylor a great deal of fear and post traumatic stress not forgotten for several years now.

204.    ETO knew or should have known that her reckless conduct would result in a foreseeable termination of the parties legal relationship, because her fraud was predicated on circumventing immigration laws. At all times material, it was foreseeable to ETO her acts would cause harm to Baylor.

205.    As a direct and proximate result of ETO's reckless conduct, Baylor has suffered injury and damages for which ETO is liable, including but not limited to loss of income, loss of employment, loss of housing and other economic losses.



206.

## COUNT IV
### (Intentional Infliction of Emotional Distress)

207.    Baylor reasserts by reference to assertions contained in the foregoing paragraphs of this Complaint.

208.    ETO's conduct, detailed above, was intentional, reckless, concerted, criminal and deliberately violative of federal immigration laws, including State law. ETO engaged in a series of acts that, taken together, constitute extreme and outrageous behavior. ETO purposefully initiated an immigration marriage benefit scam to extort money or property from Baylor, by, *inter alia*, maliciously threatening to easily defame him (because of his skin color or race) with scandalous accusations of criminal conduct that never occurred.

209.    For four years, ETO's criminal conduct has colorfully terminated Baylor's parenting rights, employment opportunities and equal housing rights. In spite of her knowledge that Baylor had engaged in no wrongdoing of any kind, ETO proceeded with her immigration scheme of falsely allege Baylor committed abuse. As part of that plan, ETO was directed by EP to make untrue and materially misleading statements to an extrinsically independent domestic abuse program, and assisted ETO in filing multiple fraudulent reports with domestic abuse in court and with the Saint Paul police department over a long period of time. ETO's conduct was flagrant, heartless and non-Christian.

210.    ETO's acts offend against generally accepted standards of decency and morality and are atrocious and utterly intolerable. ETO is part of a larger community of aliens commonly aware of immigration benefit fraud schemes, and knew that her illegal actions would cause Baylor severe emotional distress.

211.    ETO's outrageous conduct caused Baylor to suffer severe emotional distress, extreme fear and panic.

212.    As a direct result of ETO's misconduct, Baylor suffered damage and incurred substantial loss, including, without limitation, pain and suffering, emotional trauma, insult, embarrassment, humiliation, public ridicule, anguish, stress, and anxiety, injury to reputation, special damages, court costs, fees and out-of-pocket expenses in the sum of $850,000 or such greater amount as is determined by a Jury.

## COUNT V
### (Unjust Enrichment)

213.    Baylor reasserts by reference to assertions contained in the foregoing paragraphs of this Complaint.

214.    By reason for the foregoing conduct — including fraudulently inducing Baylor into a marriage Contract, breaching the Contract deliberately, and failing and refusing to honor her legal and contractual obligations under federal immigration or State law — ETO has profited and enriched herself unjustly at the expense and to the detriment of Baylor.

215.    ETO should not be permitted, in equity and good conscience, to retain for herself the extortion money that rightfully belongs to Baylor, or immigration green card.

216.    By reason of the foregoing, Baylor has been injured in the amount to be determined not less than $178,335, plus interest, for which sum ETO is liable to Baylor.

## COUNT VI
### (Cost, Expenses and Fees)

217.    Baylor reasserts by reference to assertions contained in the foregoing paragraphs of this Complaint.

218.    As asserted herein above, this action is necessitated by ETO's false and fraudulent inducements and willful breach of Contract, for which Baylor will be declared the prevailing party.

219.    By reason of the foregoing, Baylor is entitled to reimbursement from ETO for all costs, expenses, and fees (with interest thereon) incurred by Baylor in commencing and litigating this action, in an amount to be determined at trial.

## PRAYER FOR RELIEF

1.  A Judgment that the marriage Contract is null void, invalid, and unenforceable;

2.  Return of the $31,075 ETO extorted from Baylor;

3.  An award of actual damages in an amount to be proven a trial;

4.  An award of compensatory damages in the amount of $8,000,000 as a result of ETO's specific intent to harm Baylor and the actual harm inflicted on Baylor for 8 years;

5.  An award of treble damages;

6.  An award of punitive damages;

7.  A restraining order enjoining ETO from further harassing, intimidating, threatening Baylor by filing false reports or petitions;

8.  Reasonable costs and fees;

9.  Pre' and post-judgment interest as applicable;

10. The opportunity to amend this Complaint, and;

11. Any other relief the Court deems just and appropriate.

## DEMAND JURY TRIAL

Baylor hereby demands a jury trial on all issues triable thereby.

Signed this 4th Day of
October 2021

Respectfully Submitted,

Christopher Gary Baylor
AAFA Advocate
3206 South Hopkins Ave, Suite 43
Titusville, Florida 32780
P: (484) 682-2605
cbaylor@aafa-law.org